UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WARREN EDWARD FOLGER,

                 Petitioner,          **DECISION AND ORDER**

   -vs-                    No. 03-CV-0239(VEB)

JAMES CONWAY, Superintendent, Attica
Correctional Facility,

                Respondent.
_____

## INTRODUCTION

Petitioner, Warren Edward Folger ("Folger"), has brought this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in Erie County Court on one count of first degree manslaughter. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Folger's conviction after a jury trial stems from his alleged involvement in the beating death of Michael Tomczak ("Tomczak"), who happened to be dating Folger's former girlfriend, Gloria Jern ("Jern"); Jern had broken off her relationship with Folger in February of 1997.

Late on the night of February 6, 1998, Tomczak was at a bar in the City of Depew called The Clover with Jern after having gone bowling with friends. At about 1:45 a.m., Folger appeared at a bar across the street from The Clover called Margie's. Leigh Ann Wacht ("Wacht"), a good friend of Jern's, was working at Margie's that night. She telephoned Jern at The Clover and told her not to come over to Margie's because she knew of the problems Jern had with Folger. Folger apparently knew Jern was at The Clover, as he had seen her car in the

parking lot. After Folger left Margie's at about 2:45 a.m., Wacht called Jern to alert her.

Jern walked outside to make sure that Folger was leaving, and then Tomczak joined her outside. Upon seeing Folger walk to his car in Margie's parking lot, she assumed that he was leaving. Folger got into his car and then drove by the two slowly, glaring at Jern without saying anything. When Jern saw Folger put his directional signal on, she assumed that he was coming back. Jern and Tomczak then moved into an alley and watched for Folger for a few minutes. At that time, they noticed Folger standing in the parking lot at Margie's. Jern wanted to stay there until Folger left, but she was not wearing her coat. Tomczak told her to go back inside The Clover, saying that he would stay outside and watch to see what Folger did. Jern returned inside The Clover to wait for Tomczak.

From the window at Margie's, Wacht had seen Tomczak walking toward the parking lot. Minutes later, Robert Dziengielewski ("Dziengielewski") drove into Margie's parking lot and observed Tomczak lying on his back on the ground. To Dziengielewski, Tomczak's face "looked like a smashed-in pumpkin" with "blood coming from every place on his face." T.162.[1] Before running inside to Margie's to get help, Dziengielewski looked at the clock in his car and saw that it was 2:53 a.m. Another passer-by, Michael Oddo ("Oddo"), heard gurgling sounds coming from Tomczak so he turned Tomczak on his side.

By the time the paramedics arrived, Tomczak had no pulse.  Dr. Fazlollah Loghmanee performed the autopsy on Tomczak, who was 5' 11½" tall, weighed 205 pounds, and was thirty-seven years-old at the time of his death. Dr. Loghmanee found areas of abrasion and swelling on the back of Tomczak's head, caused by contact with a flat surface. T.495, 528. Tomczak had also

---

[1] Citations to "T.__" refer to the trial transcript.

sustained fractures of his nose and cheekbone, and one tooth and a dental plate had been

dislodged and had caught in his throat. T.501-02, 522, 525-26. Tomczak had lacerations and

hemorrhages on the side of his head, and multiple bite marks on the sides and underneath his

tongue. T.520. Dr. Loghmanee observed blood in Tomczak's nasal and oral cavities, his airway,

and the alveoli of his lungs. T.501, 510, 542. He also saw indications that Tomczak's brain had

swollen. Based on these findings, Dr. Loghmanee testified that Tomczak had sustained trauma to

his head and face and that, to a reasonable degree of medical certainty, he had died from

asphyxiation due to aspiration of his own blood as a result of blunt force trauma to his face.

T.513.

On cross-examination, Dr. Loghmanee agreed that Tomczak's injuries could have been

inflicted by simple punches and that Tomczak could have been knocked unconscious by falling

and hitting his head on the pavement. T.514, 518. Dr. Loghmanee acknowledged that Tomczak

had a large, nonmalignant brain cyst near his optic nerve. According to Tomczak's personal

physician, Tomczak had been treated for high blood pressure and high cholesterol but had not

complained of any symptoms associated with the type of brain cyst that he had. T.531, 534. Dr.

Loghmanee admitted that the first symptom of such a cyst could be a seizure.

The defense called Dr. Louis Roh, Deputy Chief Medical Examiner for Westchester

County. Contrary to Dr. Loghmanee, Dr. Roh testified that if Tomczak really had died after

aspirating his own blood, the slides of Tomczak's lung tissue would have depicted red dots of

blood in the cells of the tissue. However, Dr. Roh found that the victim's lung tissue appeared

normal. T.600-02.  Dr. Roh testified that he found no evidence that the victim's brain had

swollen. T.607-09. Although he conceded that the victim's facial injuries were caused by blunt

trauma, he testified that neither the nose fracture nor the cheekbone fracture was a fatal wound. T.617. However, Dr. Roh conceded that the facial injuries could have resulted from being kicked. T.645. Dr. Roh concluded that, to a reasonable degree of medical certainty, the victim had died of a seizure. T.604, 624. He based this conclusion on the presence of the brain cyst, the numerous bite marks on the sides of and underneath the victim's tongue, and the presence of foam around the victim's mouth. T.604-05.

Dr. Roh acknowledged on cross-examination that it was "strange" that Tomczak would live his whole life without any symptoms from the cyst and then coincidentally die of a seizure at the same time he received an extensive beating. T.648. On redirect examination, Dr. Roh testified that being involved in a "some kind of hand-to-hand fighting" could trigger a seizure. T.683.

To rebut Dr. Roh's testimony, the prosecutor called Dr. Michael Baden, a part-time director of medical/legal investigation for the New York State Police, who testified that in his opinion, the victim sustained blunt force trauma to the face which caused obstruction of his trachea–first by blood, and then by his teeth and dental plate. T.709. Dr. Baden opined that the victim's facial injuries were more consistent with being kicked by a boot than by being punched. T.718. Dr. Baden testified that presence of foam at the mouth was not a sign of a seizure and that bite marks occur in only ten percent of all seizures and therefore were not diagnostic. T.757-58. He further explained that the growth on Tomczak's brain was a dermoid cyst, an abnormal growth of skin that existed from birth. T.712-13. Dr. Baden deemed it an incidental finding that had nothing to do with the cause of death.

With respect to the physical evidence found on the night of the arrest, the police

discovered blood on the driveway of Folger's house, as well as on the rear panel, the floor mat, and the gas pedal of Folger's car. The results of the DNA testing indicated that it matched Tomczak's blood. T.264-66, 393-95, 488-90. Officer McCracken telephoned Folger's apartment to gain entry; when Folger did not answer, the officer left a message on the answering machine but to no avail. T.267-68, 271. Finally, after obtaining a search warrant, the police broke down the door. Inside the house the police found blood on Folger's jacket and right boot, as well as on the carpet, a chair, and some facial tissue. Folger's blood was on the tissue and on part of his jacket; the rest of the blood was Tomczak's. T.397, 489-90. The only visible injury sustained by Folger was a scrape on his knuckle.

Folger took the stand and testified in his own behalf. Although he did not explain why he had gone to Margie's that night, he did say that he looked out the window a few times toward The Clover. He stated that he knew that his ex-girlfriend, Jern, was at The Clover. Folger stated that when he left Margie's, he intended to go home. However, he became "curious" when he saw Jern and Tomczak together. After he drove by the pair slowly without saying anything, he felt "a little upset." T.778-80, 802-03, 807. Folger then decided to return to Margie's for another drink and to catch "another glimpse" of Jern. T.808.

According to Folger, Tomczak casually walked from The Clover toward the parking lot of Margie's. Folger said that Tomczak "looked pretty big" as he was crossing the street; he then denied that he was "sizing up" Tomczak. T.822.[2] Folger conceded that Tomczak did not have any facial injuries at that point. T.831, 833. According to Folger, Tomczak said nothing until he

---

[2] The autopsy revealed that Tomczak weighed two hundred five pounds–seventy five pounds less than Folger. Tomczak also had a blood alcohol content ("BAC") of .17 percent.

was within punching distance, at which point he said, "What the fuck is your problem?" Tomczak then swung twice at Folger; these punches only "clipped" and "grazed" Folger because he was able to "duck back." T.781, 827.

Folger got Tomczak in a headlock and started "punching him in the face." T.819. Folger had no idea how many times he hit Tomczak in the face. T.823. Folger stated that Tomczak was throwing punches at him, too. T.854. According to Folger, they both fell down and rolled around, throwing body punches at each other until they both tired. T.820.

Folger testified that when he left, Tomczak was standing up and holding his mouth. T.782. Folger acknowledged that he had inflicted all of the injuries sustained by Tomczak, except for the injury to the back of Tomczak's head. T.829, 842, 847-48. (Medical testimony established that the wound on the back of Tomczak's head resulted from his hitting a flat surface, such as the ground.) Folger agreed that Tomczak was "clearly seriously injured" when Folger left the scene.

Folger's injuries consisted of cuts on his knuckle which resulted from his having struck Tomczak. T.824. Folger said that he never saw Tomczak with a weapon and did not testify that he was afraid of Tomczak When asked whether he gave Tomczak a "severe" beating, Folger answered by saying that he was protecting himself, and that they had a fistfight. T.829, 842.[3]

The jury returned a verdict convicting Folger of first degree manslaughter. Folger was sentenced to an indeterminate term of imprisonment of twelve and one-half to twenty-five years. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously

---

[3] However, apart from the minor scrapes on his knuckle, Tomczak had no other injuries from allegedly hitting Folger.

affirmed Folger's conviction on March 15, 2002. *People v. Folger*, 292 A.D.2d 841, 740

N.Y.S.2d 740 (App. Div. 4th Dept. 2002). The New York Court of Appeals denied leave to

appeal. *People v. Folger*, 98 N.Y.2d 675, 774 N.E.2d 229, 746 N.Y.S.2d 464 (N.Y. 2002).

This habeas petition followed in which Folger raises the following grounds for habeas

relief: (1) petitioner's statement to police that he did not use any weapons during his fight with

the victim was improperly admitted; (2) petitioner's Fourth Amendment rights were violated; (3)

evidence of the victim's non-violent nature was improperly admitted; (4) the evidence against

petitioner was insufficient; (5) the trial court erroneously admitted speculative expert testimony;

and (6) the grand jury should have been given a circumstantial evidence instruction. Respondent

does not raise the defense of non-exhaustion, and indeed, all of Folger's claims appear to be fully

exhausted and properly before this Court. For the reasons set forth below, the petition is denied.

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal

review of his conviction must demonstrate that the state court's adjudication of his federal

constitutional claim resulted in a decision that was contrary to or involved an unreasonable

application of clearly established Supreme Court precedent, or resulted in a decision that was

based on an unreasonable factual determination in light of the evidence presented in state court.

*See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

### Merits of the Petition

### 1.     Improper admission of petitioner's statement to police – violation of Sixth Amendment right to counsel

The Sixth Amendment right to counsel attaches "at the initiation of adversary judicial

proceedings," such as arraignment or filing of an indictment. *United States v. Yousef*, 327 F.3d 56, 140 (2d Cir. 2003) (*per curiam*) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)); *see also United States v. Abdi*, 142 F.3d 566, 569 (2d Cir. 1998). Once the right has attached, statements elicited by the government outside the presence of a defendant's counsel are inadmissible in the government's case-in-chief unless accompanied by a valid waiver of this right. *Yousef*, 327 F.3d at 140; *Abdi*, 142 F.3d at 569.

The right to counsel guaranteed by Section 6 of Article 1 of the New York State Constitution has been extended beyond those of the Fifth and Sixth Amendments of the Federal Constitution. The New York Court of Appeals has made explicit New York's constitutional guarantees of due process, the privilege against self-incrimination and the right to counsel by holding that "[o]nce an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney." *People v. Arthur*, 22 N.Y.2d 325, 292 N.Y.S.2d 663, 239 N.E.2d 537 (N.Y. 1968).

Under either State or Federal law, a Sixth Amendment violation occurs, however, only if the government has taken an action "that was designed deliberately to elicit incriminating remarks." *United States v. Edwards*, 342 F.3d 168, 182 (2d Cir. 2003) (citing *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993)); *see also People v. Lynes*, 49 N.Y.2d 286, 295, 401 N.E.2d 405, 425 N.Y.S.2d 295 (N.Y. 1980). "[M]erely fortuitous receipt of incriminating statements," by contrast, does not implicate the Sixth Amendment's protections. *Id.* (citing *Rosa*, 11 F.3d at 329). The Sixth Amendment's protections extend to "situations that 'look' like government interrogations." *Id.* (quoting *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996) (*per curiam*)). However, if a criminal defendant proceeds to make incriminating statements

"without any prompting or questioning by [government] officers," his Sixth Amendment rights are not violated even if he had previously requested counsel. *Edwards*, 342 F.3d at 182.

The Court now turns to a review of the facts presented at the suppression hearing. On the morning of his arrest, while sitting in the booking room at the police station, Folger was about twenty-five feet away from Lieutenant Hoffman. Hoffman testified that he was discussing with two other officers (Fusani and Garry) whether a weapon had been found during the execution of the search warrants. Folger apparently overheard their conversation, in which Hoffman asked, "What do you think he hit him with?" Hoffman testified that Folger called out that he did not hit Tomczak with anything.

Fusani's testimony about this exchange, however, was less detailed. He recalled that Hoffman asked whether the officers had found a weapon yet, and Fusani replied that they had not, but that they had not yet searched the garage. Fusani testified that he then heard a voice say something, but he could not hear what was said or who said it. Fusani could not say whether Folger was in the vicinity when he had the conversation with Hoffman. Garry testified that he did not hear any conversation in the detective bureau on the morning of Folger's arrest with respect to the issue of whether any weapons were used in the incident for which Folger was arrested.  Relying primarily on Hoffman's testimony, both the suppression court and the appellate court held that Folger's statement was entirely spontaneous and not the produce of custodial police interrogation or its functional equivalent.

In his Reply Memorandum of Law, Folger argues the suppression court erred in relying on Hoffman's testimony about Folger's alleged statement, contending that neither Fusani nor Garry could adequately substantiate his story. Folger asserts that his statement was not

spontaneous because he was "subjected to the equivalent of custodial interrogation." Petitioner's Reply Memorandum of Law at 11 (Docket #13).

The Supreme Court has explained that the *Miranda* safeguards only "come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). "'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* In determining whether there was an interrogation, courts look for "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301 (emphasis in original).

*Rhode Island v. Innis* is instructive. There, respondent Innis was arrested as a suspect in two crimes--the murder of a taxicab driver using a shotgun and the robbery of another taxicab driver with a shotgun. Three police officers who were assigned to accompany Innis during the transport began discussing that they needed to continue to look for the weapon used in the crimes since there was a school for handicapped children located nearby and they were concerned about what would happen if one of the students found a loaded shotgun. *See Innis*, 446 U.S. at 295 (noting that one of the officers stated something to the effect of, "God forbid a little girl might find the gun and hurt herself")  The respondent then interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located.

The Supreme Court agreed with the court below that the officers' comments struck a "responsive chord" in respondent's mind but found that although respondent was subjected to "subtle compulsion," the court below "erred . . . in equating 'subtle compulsion' with interrogation." *Id.* at 303. The Supreme Court determined that it could not be said that the

officers should have known that their conversation was "reasonably likely to elicit an incriminating response from the respondent" since there was nothing in the record to suggest that the officers were aware that the respondent was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children" or that the respondent was "unusually disoriented or upset at the time of his arrest." *Id.* at 302-03.

In order to grant habeas relief, this Court must find that the state courts "unreasonably applied" clearly established Supreme Court law in holding that Folger's statements were spontaneous and not the result of custodial interrogation or its functional equivalent. Given the majority's holding in *Innis*, discussed above, in which the facts[4] (in this Court's opinion) weighed quite heavily in favor of the accused, the state courts' conclusions in Folger's case clearly were in line with Supreme Court precedent on this issue.[5] Therefore, habeas relief cannot issue on this claim.

**2.       Fourth Amendment claims**

Folger raises several arguments concerning the search warrants that were issued for his home, garage, and car. As respondent correctly notes, none of these claims is cognizable on

---

[4] Following is a discussion of the facts from *Innis*, as viewed by two of the dissenting judges: "The Court attempts to characterize [Officer] Gleckman's statements as "no more than a few off hand remarks" which could not reasonably have been expected to elicit a response. If the statements had been addressed to respondent, it would be impossible to draw such a conclusion. The simple message of the "talking back and forth" between [Officers] Gleckman and McKenna was that they had to find the shotgun to avert a child's death. One can scarcely imagine a stronger appeal to the conscience of a suspect–any suspect–than the assertion that if the weapon is not found an innocent person will be hurt or killed. And not just any innocent person, but an innocent child–a little girl–a helpless, handicapped little girl on her way to school. The notion that such an appeal could not be expected to have any effect unless the suspect were known to have some special interest in handicapped children verges on the ludicrous. As a matter of fact, the appeal to a suspect to confess for the sake of others, to 'display some evidence of decency and honor,' is a classic interrogation technique." *Innis*, 446 U.S. at 306 (Marshall & Brennan, JJ, dissenting) (citing F. INBAU & J. REID, CRIMINAL INTERROGATION AND CONFESSIONS 60-62 (2d ed. 1967) (internal citation omitted)).

[5] AEDPA's reference to "clearly established Federal law, as determined by the Supreme Court" refers only "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

federal habeas review under the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone v. Powell*, the Supreme Court held that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 481-82 (emphasis added). Following *Stone v. Powell*, the Second Circuit developed a "litmus test to discern when a state prisoner has been denied an opportunity for full and fair litigation of his fourth amendment claims." *Capellan v. Riley*, 975 F.2d 67, 69-71 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830 (2d Cir. 1977) (*en banc*), *cert. denied*, 434 U.S. 1038 (1978). The panel in *Gates* observed that "'all that the [Supreme] Court required was that the state [ ] provide[ ] the *opportunity* to the state prisoner for a full and fair litigation of the Fourth Amendment claim . . . .'" *Id.* (quoting *Gates*, 568 F.2d at 839) (emphasis in original). The Second Circuit concluded that review of Fourth Amendment claims presented by habeas petitioners would be undertaken in only one of two instances: (a) if the State provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the State has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an "'unconscionable breakdown in the underlying process.'" *Id.* (quoting *Gates*, 568 F.2d 840 and citing *McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 70 (2d Cir. 1983)). Notably, all that must be shown is that the State has provided an opportunity to litigate the petitioner's Fourth Amendment claim; it matters not whether the petitioner actually "took advantage of the State's procedure." *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002).

Folger does not contend that New York failed to provide a corrective procedure to

redress his alleged fourth amendment claim. Indeed, as the Second Circuit has noted, "the

'federal courts have approved New York's procedure for litigating Fourth Amendment claims,

embodied in N.Y. Crim. Proc. Law § 710.10 *et seq.* (McKinney 1984 & Supp.1988), as being

facially adequate.'" *Capellan*, 975 F.2d at 70 n.1 (quoting *Holmes v. Scully*, 706 F. Supp. 195,

201 (E.D.N.Y. 1989) and citing *Gates*, 568 F.2d at 837 & n. 4; *Shaw v. Scully*, 654 F. Supp. 859,

864 (S.D.N.Y. 1987)). Rather, he contends that an "unconscionable breakdown" occurred

because "there were no witnesses, videotapes, confessions or weapons unearthed; [*sic*]

insufficient to establish probable cause to believe petitioner had committed any crime."

Petitioner's Reply Memorandum of Law at 14 (Docket #13). Folger cites to *Willett v. Lockhart*,

37 F.3d 1265, 1273 (8th Cir. 1994), for the proposition that a petitioner may be denied a full and

fair hearing, and that an unconscionable breakdown occurs, if the state court "excludes important

relevant evidence on the issue of probable cause." This citation, which is merely to the

concurring opinion in *Willett*, and therefore not the holding of the case, is incomplete and is

taken out of context. Moreover, there is no indication that any evidence was improperly excluded

by the suppression court; simply because there was no confession by petitioner or a weapon

discovered does not mean that probable cause to arrest petitioner was lacking. To the contrary,

there was testimony by witnesses regarding Folger's actions that night, and there was blood

found on Folger's car and in his driveway.

In any event, Folger's allegations are not sufficient to establish that "an unconscionable

breakdown" occurred in the existing process in violation of Folger's constitutional rights. *See*

*Capellan*, 975 F.2d at 71 ("Even if [petitioner] were correct in his allegation that the Appellate

Division erroneously decided this issue, a petitioner cannot gain federal review of a fourth

amendment claim simply because the federal court may have reached a different result.") (citing *Gates*, 568 F.2d at 839). The Second Circuit explained that reading *Stone v. Powell* as requiring the reviewing court "to focus on the correctness of the outcome resulting from the application of adequate state court corrective procedures, rather than on the existence and application of the corrective procedures themselves, . . . would be assuming, implicitly at least, that state courts were not responsible forums in which to bring constitutional claims such as is presented herein." *Capellan*, 975 F.2d at 71. According to the Second Circuit, *Stone v. Powell* "expressly discourage[d] [it] from making any such assumption." *Id.* (citing 428 U.S. at 493-94 n. 35) ("[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States."). Thus, because Folger only asserts that the Appellate Division erred in its ruling, this Court lacks the authority to review his claims "since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Id.* Accordingly, Folger's Fourth Amendment claims are not cognizable in this federal habeas proceeding and must be dismissed.

**3.      Erroneous admission of evidence regarding the victim's non-violent nature**

Folger contends that reversal of his conviction is warranted on the basis that the trial erred in permitting testimony regarding the "nonviolent nature of the victim in the absence of evidence that defendant was aware of the victim's nonviolent nature." *People v. Folger*, 292 A.D.2d at 841. The Appellate Division agreed, but held that the error was harmless because "[t]he evidence of guilt [was] overwhelming, and there [was] no 'significant probability . . . that the jury would have acquitted the defendant had it not been for the error[.]'" *Id.* at 841-42

(quoting *People v. Crimmins*, 36 N.Y.2d 230, 242, 367 N.Y.S.2d 213, 326 N.E.2d 787 (N.Y. 1975) (ellipsis in original)).

Respondent asserts that even if the admission of this evidence were erroneous under New York state law, it was admissible under Federal law pursuant to Rule 404(a)(2) of the Federal Rules of Evidence. Respondent's Memorandum of Law at 15 (Docket #9) (citing *United States v. Keiser*, 57 F.3d 847, 854 (9th Cir. 1995) ("These cases suggest a common understanding in the federal courts that [a defendant's] 'personal knowledge' of the victim's propensity for violence is simply not a prerequisite for admission of victim [non-violent] character evidence under Rule 404(a)(2)."). The Court is inclined to agree with respondent that this claim does not amount to error of a Federal constitutional magnitude. In any event, as the Appellate Division found, any error that resulted from the admission of the character evidence was harmless.

The Supreme Court has articulated two different tests for determining whether an error may be overlooked by reason of its harmlessness. In *Brecht v. Abrahamson*, the Court held that on *collateral* review of a state conviction, an error will be found to be harmless if it did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In *Chapman v. California*, the Supreme Court held that on *direct* review of a criminal conviction, an error may be overlooked only if it is "harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). Following the passage of AEDPA, the Second Circuit repeatedly has questioned whether the "applicable test on habeas review of a state conviction remains the one set forth in *Brecht*, or instead should be a determination whether the state court's decision was contrary to, or involved an unreasonable application of *Chapman*," but has declined to decide the question because it

concluded that the result was the same under either test. *Brown*, 355 F.3d at 91 (internal

quotation marks and citations omitted); *accord, e.g., Howard v. Walker*, 406 F.3d 114, 124 (2d

Cir. 2005); *Benn v. Greiner*, 402 F.3d 100, 105 (2d Cir. 2005); *Cotto v. Herbert*, 331 F.3d 217,

253 (2d Cir. 2003); *Ryan v. Miller*, 303 F.3d 231, 254 (2d Cir. 2002); *Noble v. Kelly*, 246 F.3d

93, 101 n. 5 (2d Cir.), *cert. denied*, 534 U.S. 886 (2001); *Loliscio v. Goord*, 263 F.3d 178, 185 n.

1 (2d Cir. 2001). The Second Circuit settled at least a part of this question by holding that "when

a state court *explicitly conducts harmless error review* of a constitutional error, a habeas court

must evaluate whether the state unreasonably applied *Chapman*." *Gutierrez v. McGinnis*, 389

F.3d 300, 306 (2d Cir. 2004) (emphasis supplied).

   In the instant case, the Appellate Division did not cite federal precedent in disposing of

Folger's evidentiary claim, instead citing to New York's interpretation of *Chapman. People v.

Folger*, 292 A.D.2d at 841 (citing *People v. Crimmins*, 36 N.Y.2d at 242). The use of the phrase

"overwhelming evidence of defendant's guilt" could refer either to New York's

non-constitutional error standard or to New York's incorporation of *Chapman* as its standard for

examining federal constitutional errors for harmlessness, as "overwhelming" proof is required

for both. *See Gutierrez*, 389 F.3d at 307 (citing *Crimmins*, 36 N.Y.2d at 240-42). However, for

AEDPA deference to attach to a state adjudication of a federal claim, the Second Circuit does

not require state courts to cite federal precedent when disposing of that claim. *Id.* at 308 (citing

*Sellan v. Kuhlman*, 261 F.3d 303, 310-12 (2d Cir. 2001)). Therefore, the question is whether the

Appellate Division reasonably applied *Chapman* or New York's equivalent interpretation.

   As noted above, the *Chapman* court held "that before a federal constitutional error can be

held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable

doubt." *Chapman*, 386 U.S. 24. The Supreme Court explained that this standard amounts to inquiring "'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Id.* (quoting *Fahy v. State of Connecticut*, 375 U.S. 85, 86-87 (1963)). Stated another way, "[a] constitutional error is harmless when 'it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999) (in turn quoting *Chapman*, 386 U.S. at 24) (other citation omitted)).  "In making a determination of harmless error, the court looks to the record as a whole, considering the overall strength of the prosecution's case, the importance of the improperly admitted evidence, and whether the evidence was emphasized at trial." *Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004) (citing *Raheem v. Kelly*, 257 F.3d 122, 142 (2d Cir. 2001), *cert. denied*, 534 U.S. 1118 (2002); *Wray v. Johnson*, 202 F.3d 515, 526 (2d Cir. 2000)).

At Folger's trial, the character evidence at issue came from Jern, Tomczak's girlfriend. She testified that he was a kind, quiet person, and that she never observed him "throw insults back and forth." T.40. Defense counsel did not object to this testimony. Wacht, a friend of Jern's, knew Tomczak from seeing him out at bars about twenty times over a few years; she described him as "happy-go-lucky and carefree." T.109. The prosecutor next asked Wacht whether she had ever seen him in a fight. After she had replied, "No," the trial court sustained defense counsel's objection. T.109.

Even though the prosecution's case was circumstantial, it was, overall, very compelling. The prosecutor referred to Tomczak's easy-going nature in his summation, but it was not a focal point of his argument. Most important, one need only compare the severity of Tomczak's

-17-

injuries (a face smashed in "like a pumpkin") to the negligible injuries suffered by Folger

(scraped knuckles) to see that the evidence that Tomczak was allegedly a quiet, easy-going

person was not  central to the prosecution's case-in-chief or the defense of justification. Even

accepting that Tomczak was the initial aggressor, the beating administered by Folger went far

beyond what was permissible under the self-defense statute,[6] given the circumstances at hand.

Not only was Tomczak extremely intoxicated (he had a BAC of .17), he was also seventy-five

pounds lighter than Folger. Folger testified that the two punches Tomczak threw when he first

approached only "grazed" Folger; Folger did not explain why he did not simply push the smaller

man away or just punch him once. Viewing the record in its entirety, the Court is confident that

the improperly admitted testimony did not contribute to the verdict against Folger. Thus, the

Court finds that the Appellate Division did not unreasonably apply *Chapman*'s standard in

determining that the error was harmless.  This claim accordingly does not provide a basis for

habeas relief.

**4.      Insufficiency of the evidence**

Folger contends that the Appellate Division's decision that the evidence was legally

insufficient to disprove his defense of justification beyond a reasonable doubt "was contrary to,

and did include an unreasonable application of settled constitutional law." Petitioner's Reply

Memorandum of Law at 23 (Docket #13). The relevant question for this Court on Federal habeas

review is whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[6]      New York law provides that "[a] person may . . . use physical force upon another person *when and to the extent he reasonably believes such to be necessary to defend himself* or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person[.]" N.Y. Penal Law § 35.15(1).

doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *accord Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002). Thus, Folger "bears a very heavy burden" in challenging the legal sufficiency of the evidence in support of his state-court criminal conviction. *Einaugler v. Supreme Court*, 109 F.3d 836, 840 (2d Cir. 1997). On habeas review, this Court is not permitted to "'make its own subjective determination of guilt or innocence.'" *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999) (quoting *Herrera v. Collins,* 506 U.S. 390, 402 (1993)). Moreover, this Court must defer to the jury's "assessments of the weight of the evidence and the credibility of witnesses." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996).

Here, Folger's argument that the evidence was insufficient to disprove his defense of justification is entirely dependent on the jury's having accepted his testimony regarding the fight between him and the victim. However, the jury chose not to credit Folger's testimony and his expert witness's testimony and instead decided to accept the testimony proffered by the prosecution witnesses. The jury is exclusively responsible for determining the credibility of a witness, and a habeas court may not revisit the fact-finder's credibility determinations. *Marshall v. Lonberger*, 459 U.S. 422, 432-35 (1983); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993). A reviewing court may not "'reassess the fact specific credibility judgments by juries or . . . weigh conflicting testimony.'" *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (quoting *Anderson v. Senkowski*, 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992)). Furthermore, the jury heard proof that the victim, who weighed seventy-five pounds less than Folger and was extremely intoxicated at the time, had his face smashed in, had a fractured nose and cheekbone, and had several teeth dislodged; Folger, on the other hand, suffered only a superficial scrape on his knuckles.

As the Second Circuit has instructed, "'[t]he task is to ascertain whether the record evidence on which the trier of fact relied was of sufficient quality to support the verdict. . . . Since it is the trier of fact that weighs the evidence, determines credibility and draws inferences from historic to ultimate facts, a federal court, in analyzing sufficiency, should not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.". . . Instead, it stands in the shoes of the state trial court, and must consider whether a rational trier of fact could properly find or infer that the accused is guilty beyond a reasonable doubt.'" *Rapetti v. James*, 784 F.2d 85, 91 (2d Cir. 1986) (quoting *Mallette v. Scully*, 752 F.2d 26, 31 (2d Cir. 1984) (quotations and citations omitted)). Based on the record evidence, the Court cannot say that the jury was irrational in finding that petitioner used a disproportionate amount of force, and that therefore the prosecution had negated the justification defense beyond a reasonable doubt. Accordingly, this claim does not afford a basis for habeas relief.

**5.      Improper admission of expert rebuttal testimony**

Folger contends that the trial court abused its discretion in permitting the prosecution's rebuttal expert witness, Dr. Baden, to provide "speculative" expert testimony. According to Folger, Dr. Baden's evidence was entirely speculative and ultimately prejudicial to the defense. On direct appeal, the Appellate Division summarily rejected this claim as "without merit." *People v. Folger*, 292 A.D.2d at 841.

At trial, Dr. Baden was permitted to testify that some of the victim's injuries were "entirely consistent" with having been inflicted by a boot. The defense expert, Dr. Roh, had testified earlier that although it was "possible" that the victim had been kicked in the face, his facial injuries also "could have" been caused by a "fall and/or punch." T.672. The prosecution

called Dr. Baden to rebut that testimony; he stated that the victim's significant facial fractures were inconsistent with having been punched. T.717. Dr. Baden opined that the injuries were "consistent with" having been kicked by petitioner's boots, which Dr. Baden had examined. T.715-16. Dr. Baden explained what he meant by the phrase "consistent with" and acknowledged that the injuries could have been caused by other boots, or by an object of a similar shape. T.718-20. Dr. Baden also testified that, in his opinion, the victim's severe facial injuries were "not consistent with" having been caused by punching. T.717. In the absence of evidence that any other object was used to beat the victim, Dr. Baden concluded that it was "more likely" that the petitioner had kicked the victim in the face.

The Supreme Court has held that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *accord United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985); *United States v. DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993). When Folger states that Dr. Baden testified that it was "possible" that the victim's injuries were inflicted by a boot, he mischaracterizes the testimony. Dr. Baden instead testified that he examined the boots that Folger was wearing to "see if they matched up with the injuries sustained by the decedent." T.715-16. Dr. Baden testified that in his opinion, the right boot (which was spattered with blood) "would have been the type of object, would have been entirely consistent with causing the blunt force injuries suffered by decedent." T.716. Defense counsel objected to Dr. Baden's response on the basis that it was "[s]peculative." *Id.* The trial court decided to allow the testimony to be "fair," noting that it had allowed defense counsel to ask his expert witness whether the injuries "could be consistent with a fist[.]" *Id.* Dr. Baden

conceded that "some injury to the head and face could be caused by punching" but opined that

the fractures to the note and upper jaw were "not consistent with punching" but was "entirely

consistent with being kicked with a booted foot." T.717. Defense counsel then thoroughly and

pointedly cross-examined Dr. Baden, not only about his opinions, but about his credentials and a

prior lawsuit he had filed after he was demoted from being a chief medical examiner in New

York City. Defense counsel forced Dr. Baden to concede that "consistent with" was a "catch-all

phrase that medical examiners use when there's more than one possible way that an injury could

occur[.]" T.718.

At the outset, the Court does not see how Dr. Roh's testimony that the victim's massive

injuries "could have" been caused by a fall or a punch is *less* speculative than Dr. Baden's

testimony discussed above. Nevertheless, this is not a tit-for-tat exercise; the Court is not

implying that speculative testimony is properly admitted to combat improperly admitted

speculation. Moreover, the propriety of Dr. Roh's opinion is not a question before this Court.

After reviewing Dr. Baden's testimony, the Court has no difficulty concluding that his expert

opinions on causation were not speculative. Therefore, the trial court did not abuse its discretion

in allowing Dr. Baden to testify that some of the victim's injuries were "consistent with" being

kicked by a booted foot and that other of the injuries were "not consistent with" being punched.

In sum, the Court finds no error under State law, let alone any error of Federal constitutional

magnitude. For this reason, habeas relief is not warranted.

**6.     Challenge to the jury instructions given to the grand jury**

Folger contends that the grand jury should have been particularly instructed on how to

assess a case that is based on circumstantial evidence. Because this claim alleges defects in the

grand jury proceeding, it does not present a Federal constitutional question cognizable on habeas review.

In *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989), the Second Circuit considered whether claims of error in a grand jury proceeding, including insufficiency of evidence to indict and the prosecutor's failure to present exculpatory evidence, are cognizable in a habeas corpus proceeding.  The court held that such challenges to a state grand jury proceeding will not permit habeas relief, finding dispositive the Supreme Court's holding in *United States v. Mechanik*, 475 U.S. 66 (1986). Confronted with a constitutional attack on a federal grand jury proceeding, the Supreme Court stated in *Mechanik* that

> the petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70 (footnote omitted).  Based on that proposition, the Second Circuit reasoned that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a *petit* jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in federal court."  *Lopez*, 865 F.2d at 32 (holding that habeas petitioner's "claims of impropriety before the grand jury in this case concern[ing] the sufficiency of the evidence, a failure to develop exculpatory evidence by the prosecutor, the presentation of prejudicial evidence and error in explaining the law" . . . were "cured in the trial before the petit jury, which convicted").  Thus, the guilty verdict at Folger's jury trial precludes habeas review of his claim relating to the instructions provided at the grand jury proceeding.

## CONCLUSION

-23-

For the reasons stated above, petitioner Warren Edward Folger's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      August 17, 2006
            Buffalo, New York.